United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 12, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 05-20921
_____

UNITED STATES OF AMERICA,

                               Plaintiff - Appellee,

                    versus

DELIA GOMEZ-MORENO, also known
as Delia Moreno Gomez,

                               Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas, Houston
USDC No. 4:05-CR-126-ALL
_____

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Delia Gomez-Moreno appeals the district court's denial of her motion to suppress evidence obtained during a search of her residence for illegal aliens. Because the federal agents and police officers impermissibly created the conditions that they deemed to be exigent circumstances for warrantless entry into the residence, and because Gomez-Moreno's consent for a second search of the residence was not an independent act of free will, we REVERSE the district court's denial of Gomez-Moreno's motion to suppress, VACATE Gomez-Moreno's sentence, and REMAND for proceedings not inconsistent with this opinion.

At the motion to suppress hearing, Immigration and Customs Enforcement ("ICE") agent Gary Renick testified that sometime between 3:30 and 4:30 p.m. on Sunday, February 27, 2005, he began surveillance of 3806 Kennon in Houston, Texas. The surveillance responded to an anonymous telephone call stating that twenty to thirty illegal aliens would be at the residence that day. The residence consisted of two buildings: a main house in the front (the "front house") and a second, smaller house in the back that looked like a garage but had been converted into living quarters (the "back house").

During the surveillance, Renick observed two men and a woman by the front corner of the house. According to the district court, Renick believed these individuals were acting as "lookouts." Renick also observed a lot of traffic at the residence, including a Ford Thunderbird that arrived and departed several times, suggesting to him the transportation of illegal aliens. From his vantage point, Agent Renick could not identify the individuals entering or leaving the residence in the vehicles. Renick requested that a helicopter view the property.

Renick had been working for ICE and its predecessor for eight and a half years. He testified that illegal aliens are typically stored as a group in a stash house until a relative pays the smuggler's fee. He believed that the Thunderbird's activity at the residence was consistent with vehicle activity at most stash

2

houses.  Based on his training, he believed that the residence was probably a stash house.

ICE special agent Christian Kaufman testified that he met Renick at 4:30 p.m. at a small park one block across from the residence.  By 5:45 or 6:00 p.m., several other agents arrived at the park until there were approximately ten to twelve agents and police officers (collectively "officers") at the park.  While the officers were assessing the situation, a man walked past the officers, looked at them, walked to a vacant lot across the street, and then ran in the direction of the 3806 Kennon residence.  Renick testified:  "So we were thinking maybe he saw us and was going to go tell them.  So we decided we needed to just go ahead and go over there."  Renick admitted, however, that he could not say if the man actually ran to the 3806 Kennon residence, nor did the district court make any findings on the matter.  Renick testified that they decided to approach the residence to secure the exits to the front and back houses and to conduct a "knock and talk" to ask if any illegal aliens were present.

It was approximately 6:45 p.m. when the ten to twelve armed officers arrived at the residence to conduct a "knock and talk," at which time the helicopter also arrived above the residence. Kaufman and several others headed to the front door of the front house, while Renick and others proceeded to the back house. Several officers remained in the general area surrounding the two houses.

3

As they approached the front house, Kaufman and the officers with him were clearly identified as "Police" and "Department of Homeland Security." When they knocked on the front door, they received no answer, but they could hear people moving inside. One of the officers checked the door knob, which was locked. Kaufman, upon hearing a "commotion" in the backyard, made his way to the back.

Meanwhile, Renick, his partner, and a police officer knocked on the door to the back house, announcing "Police! Police! Open the door." They also clearly were labeled "Police." Through a window, Renick's partner could see "a lot of people" inside. No one responded or opened the door to the back house. Instead, upon the officers' knocking, the lights went out inside, and the officers could hear sounds from inside like that of people pushing against the door to barricade it.

At about this time, a man exited the front house through a back door but stopped when he saw the officers. Seeing the officers, the man turned and ran back inside. Kaufman and several officers drew their weapons and followed the man into the front house to protect the officers and any illegal aliens from any potential armed smugglers. They quickly secured the front house, bringing all twelve occupants out to the backyard. With their weapons drawn, the officers ordered everyone on the ground. ICE agent Juan Castillo testified that most of the persons detained were handcuffed, although Gomez-Moreno was not handcuffed. At the

4

officers' request, the helicopter shined its search light on the backyard to light up the area.

In the backyard, Gomez-Moreno identified herself as the owner. She was cooperative and agreed to speak with the officers. Renick gave her an oral Miranda warning but did not state that she was under arrest. He asked her if there were more illegal aliens in the back house, and she replied affirmatively. Renick testified that he then told her, "We're going to get in that door one way or another."[1] Apparently a transition was occurring from "knock and talk" to "knock down and search." Gomez-Moreno, however, offered to talk to the people inside, who complied with her request to open the door. Shortly thereafter, the interior ceiling of the back house caved in, revealing additional illegal aliens hiding in the attic. The officers secured the back house, bringing out thirteen people.

At approximately 7:30 p.m., after the officers secured both houses, agent Castillo brought Gomez-Moreno into the dining room and asked her to sign a written consent form giving the officers permission to search the premises. She complied. The officers conducted a second search of the residence and found money, receipts, and a "pollo list."

Later that evening, Castillo took Gomez-Moreno to the ICE office and questioned her. At the ICE office, Castillo read Gomez-

---

[1] In contrast, Gomez-Moreno testified that she heard an officer say, "If they don't open, we've got to shoot."

5

Moreno her <u>Miranda</u> rights and wrote down a statement that she gave and then signed. Gomez-Moreno stated that she rented the back house to Nemecio Rubio for $700 per month; that she was aware that he used the back house to house illegal aliens; and that on the day before the raid, she agreed to house fourteen illegal aliens in her home for $50 per alien.

In the district court, Gomez-Moreno moved to suppress evidence obtained as a result of the search of her residence. The district court denied her motion and found her guilty of conspiracy to harbor illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). On appeal, Gomez-Moreno only appeals the denial of her motion to suppress.

## II.

In an appeal of a denial of a motion to suppress evidence, this Court reviews the district court's legal conclusions <u>de novo</u> and its findings of fact for clear error. <u>United States v. Keith</u>, 375 F.3d 346, 348 (5th Cir. 2004). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed.'" <u>In re Missionary Baptist Found. of Am., Inc.</u>, 712 F.2d 206, 209 (5th Cir. 1983) (quoting <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948)). If, however, there are virtually no contested facts, our review is essentially <u>de novo</u>. <u>United States v. Vega</u>, 221 F.3d 789, 795 (5th Cir. 2000).

6

Warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search. United States v. Jones, 239 F.3d 716, 719 (5th Cir. 2001). The burden is on the government to establish circumstances justifying a warrantless search. United States v. Wallen, 388 F.3d 161, 164 (5th Cir. 2004). We may affirm a district court's ruling on a motion to suppress on any basis established by the record. United States v. Ibarra-Sanchez, 199 F.3d 753, 758 (5th Cir. 1999).

A.

The first question is whether the officers acted with probable cause and under exigent circumstances when they initially raided and searched Gomez-Moreno's home. However, we need not determine whether the officers acted with probable cause because we conclude that the exigent circumstances arose because of the conduct of the officers.

The presence of exigent circumstances is a finding of fact reviewed for clear error. Jones, 239 F.3d at 719-20. To determine whether exigent circumstances existed, we look to the following non-exhaustive list of factors:

1. the degree of urgency involved and the amount of time necessary to obtain a warrant;
2. the reasonable belief that contraband is about to be removed;
3. the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;

4. information indicating that the possessors of the contraband are aware that the police are on their trail; and

5. the ready destructibility of the contraband and the knowledge that efforts to dispose of [contraband] and to escape are characteristic behavior of persons engaged in the [contraband] traffic.

Id. at 720 (citations omitted). Exigent circumstances may not consist of the likely consequences of the government's own actions or inactions. Vega, 221 F.3d at 798-99. In determining whether officers create an exigency, this Court focuses on the "reasonableness of the officers' investigative tactics leading up to the warrantless entry." Jones, 239 F.3d at 720 (quoting United States v. Blount, 123 F.3d 831, 838 (5th Cir. 1997)). One reasonable investigative tactic is a "knock and talk" strategy where officers seek to gain an occupant's consent to search or where officers reasonably suspect criminal activity. Id. at 720. This court has held that a "knock and talk" strategy was reasonable where the officers who approached the house were not convinced that criminal activity was taking place nor did they have any reason to believe the occupants were armed. See id. at 721.

The district court found exigent circumstances and rejected Gomez-Moreno's argument that the officers created them. Specifically, the district court concluded that exigent circumstances arose when the man exited the back door of the front house, saw the officers, and ran back inside. According to the district court, it was this situation, when coupled with the anonymous tip, the activities detected during surveillance, and the

8

people that the officers saw through the window in the back house, that created probable cause and exigent circumstances. The district court concluded that these exigent circumstances permitted the officers to secure the house to protect their safety and the safety of those inside.

Not so fast. Reviewing the district court's holding for clear error, we are "left with a firm and definite conviction that a mistake has been committed." See In re Missionary Baptist Found., 712 F.2d at 209 (quoting United States Gypsum, 333 U.S. at 395). Here, the officers' "knock and talk" strategy failed. In the first place, the officers improperly executed the "knock and talk" strategy, and secondly, the "knock and talk" did not result in someone voluntarily coming to the door. The purpose of a "knock and talk" is not to create a show of force, nor to make demands on occupants, nor to raid a residence. Instead, the purpose of a "knock and talk" approach is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search. Jones, 239 F.3d at 720. Here, the officers did not engage in a proper "knock and talk" but instead created a show of force when ten to twelve armed officers met at the park, drove to the residence, and formed two groups--one for each of the two houses--with a helicopter hovering overhead and several officers remaining in the general area surrounding the two houses. When no one responded to the officers' knocking, the officers impermissibly checked the knob on the door to the front

9

house to determine if it would open, and simultaneously, at the back house, announced their presence while demanding that the occupants open the door. When officers demand entry into a home without a warrant, they have gone beyond the reasonable "knock and talk" strategy of investigation. To have conducted a valid, reasonable "knock and talk," the officers could have knocked on the front door to the front house and awaited a response; they might have then knocked on the back door or the door to the back house. When no one answered, the officers should have ended the "knock and talk" and changed their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance. Here, however, the officers made a show of force, demanded entrance, and raided the residence, all in the name of a "knock and talk." The officers' "knock and talk" strategy was unreasonable, and accordingly, the officers created the exigent circumstances.

The district court erred in finding that exigent circumstances justified entry into the front house when the man exited the back door to the front house, saw the officers, and ran back into the house. According to the officers, they followed the man into the house because they needed to surprise the occupants and any potential armed smugglers to divert a possible shoot-out. This argument fails because the officers had already lost any element of surprise when they announced their presence, knocked on the doors, and demanded entry.

Our conclusion that the officers unreasonably created the exigent circumstances is consistent with our decision in Vega. See 221 F.3d at 798-800. In Vega, police officers received a tip from an informant that three individuals would be driving through Brownsville, Texas, in a dark sedan with Florida license plates. The officers located the vehicle, placed it under surveillance, and followed it to a residence in Brownsville. The officers believed the suspects to be armed and in possession of illicit drugs. Although the officers did not have a search warrant or probable cause, "without justification, they abandoned their secure surveillance positions and took action they believed might give the suspects cause and opportunity to retrieve the weapons or dispose of the drugs." Id. at 800. Nine officers surrounded the residence. Of the nine, three clearly-identified police officers approached the front door, knocked, and announced "Brownsville Police." Simultaneously, Vega ran out a back door but was apprehended. Immediately thereafter, an officer climbed the perimeter fence into the backyard, heard movement in the house, and decided to enter the house through the back door, left open by Vega, to protect the safety of his fellow officers. The officers discovered and seized marihuana in the residence. Before the district court, the defendants moved to suppress evidence found during the search, but the district court denied the motion. On appeal, we reversed, relying primarily on United States v. Munoz-Guerra, 788 F.2d 295 (5th Cir. 1986). We held that the officers

could not rely on the "circumstances of their own making" to justify their warrantless search.  <u>Vega</u>, 221 F.3d at 800. Accordingly, we asked only whether exigent circumstances existed before the officers approached the residence, and we concluded that they did not.  <u>Id.</u>

Here, like the officers in <u>Vega</u>, Renick initiated surveillance based on a tip.  Based on his surveillance, Renick believed that the residence housed illegal aliens.  Like the nine officers who surrounded Vega's house, ten to twelve officers approached Gomez-Moreno's residence.  In approaching Gomez-Moreno's residence, it was clear that the officers' actions "might give the suspects cause and opportunity to retrieve [] weapons."  <u>See</u> <u>id.</u>[2]  As in <u>Vega</u>, the officers were clearly marked "Police," and as in <u>Vega</u>, the officers at the back house announced their presence.  Furthermore, as in <u>Vega</u>, when a man ran out of the house, the officers rushed inside to secure the house and to protect themselves.  Consistent with <u>Vega</u>, the officers may not rely on the "circumstances of their own

---

[2] Renick and Kaufman testified that smugglers are usually armed.

12

making" to justify the exigent circumstances that developed when they approached the residence. See id.[3,4]

Therefore, we hold that exigent circumstances did not justify the initial raid into and the warrantless search of Gomez-Moreno's residence, and, that the raid and search violated Gomez-Moreno's Fourth Amendment rights.

B.

As we have held above, the initial raid into and the search of Gomez-Moreno's residence was unconstitutional. Therefore, the next question is whether Gomez-Moreno's consent to conduct the second search of the residence -- which she provided shortly after the initial raid and search -- was valid.

Consent is valid only if it is voluntary. United States v. Hernandez, 279 F.3d 302, 307 (5th Cir. 2002).[5] Furthermore, if an

---

[3] Given the similarity of the facts of this case to the facts in Vega, our conclusion is dictated by Vega. To the extent that United States v. Newman, __ F.3d __, No. 05-20603 (5th Cir. Dec. 5, 2006), reaches an opposite conclusion under analogous facts, we are constrained to follow this Court's earlier panel opinion in Vega. See United States v. Zuniga-Salinas, 945 F.2d 1302, 1306 (5th Cir. 1991).

[4] We need not determine whether exigent circumstances existed before the officers approached the residence. Despite vague assertions to the contrary, no one seriously contends that the events occurring before the officers approached the residence justified entering the front house without a warrant. This is plainly evident given that the officers chose to conduct a "knock and talk" rather than raid the front house immediately.

[5] To determine whether consent is voluntary, this Court uses a six factor test:

1.  the voluntariness of the defendant's custodial

13

individual gives consent after being subject to an initial unconstitutional search, the consent is valid only if it was "an independent act of free will, breaking the causal chain between the consent and the constitutional violation." Id. Under Hernandez, this Court uses a three-factor test to determine whether consent was an independent act of free will:

> 1. the temporal proximity of the illegal conduct and the consent;
> 2. the presence of intervening circumstances; and
> 3. the purpose and the flagrancy of the initial misconduct.

Id. (citations omitted).

The district court held the initial raid and search constitutional due to exigent circumstances and probable cause, and accordingly, it did not determine whether Gomez-Moreno's subsequent consent constituted an independent act of free will. Instead, the district court only addressed whether Gomez-Moreno's consent was voluntary.

---

> status;
> 2. the presence of coercive police procedures;
> 3. the extent and level of the defendant's cooperation with the police;
> 4. the defendant's awareness of his right to refuse consent;
> 5. the defendant's education and intelligence; and,
> 6. the defendant's belief that no incriminating evidence will be found.

United States v. Hernandez, 279 F.3d 302, 307 (5th Cir. 2002)(citations omitted). No single factor is dispositive. Id.

14

Here, we do not decide whether Gomez-Moreno's consent was voluntary because even if it were, her consent was not an independent act of free will, given the closeness in time between the initial unconstitutional raid and the consent she gave, the absence of intervening circumstances, and the "flagrancy" of the initial unconstitutional raid into and the search of her home. See id.; see also Vega, 221 F.3d at 802.

## III.

Because the officers impermissibly created the exigent circumstances and because Gomez-Moreno's consent was not an independent act of free will, we hold that the searches of Gomez-Moreno's residence were unreasonable under the Fourth Amendment. For these reasons, the denial of Gomez-Moreno's motion to suppress is REVERSED, her sentence is VACATED, and the case is REMANDED for proceedings not inconsistent with this opinion.

REVERSED; VACATED; REMANDED.