IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 15, 2008

Charles R. Fulbruge III
Clerk

No. 06-40922

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JERRY ERNEST TROOP

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINBOTHAM, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

After a bench trial on stipulated facts, the district court found Defendant-Appellant Jerry Ernest Troop ("Troop") guilty of conspiring to transport an alien in violation of 8 U.S.C. § 1324. Troop now appeals the district court's denial of his motion to suppress the evidence that was discovered by Border Patrol agents when they entered and searched Troop's house without a warrant. Because the district court erred when it ruled that exigent circumstances permitted the warrantless search, we REVERSE the district court's denial of the motion to suppress, VACATE Troop's conviction, and REMAND for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Around 10:00 p.m. on July 27, 2005, Border Patrol Agent Josue Castillo ("Agent Castillo") witnessed a vehicle dropping off several individuals at a location known to be used by alien smugglers. Agent Castillo radioed for help and was joined by numerous agents thirty minutes later, including Francisco Javier Villarreal ("Agent Villarreal"), Richard Maldonado ("Agent Maldonado"), Hector Lira ("Agent Lira"), Marco Lara ("Agent Lara"), and Donald Buyer ("Agent Buyer"). All of the agents were members of the Border Patrol's Special Response Team ("SRT").[1] As members of the SRT, the agents had received specialized training in tactical tracking, building entry, arrest techniques, and rescues. In addition to their law enforcement duties, one of the goals of the SRT agents was to locate and aid aliens in order to prevent them from dying from dehydration or exposure in the summer heat.[2]

After arriving at the drop-off location, the agents found the footprints of five individuals that they believed were illegal aliens and began to track them. After the agents had tracked the individuals for some time, the suspected aliens set off a hidden Border Patrol sensor, which led the agents to believe that they were only twenty minutes behind the suspected aliens. The suspected aliens were also following a path known to be used frequently by illegal aliens to avoid a nearby checkpoint.

---

[1] Agent Villarreal had seven years of experience with the Border Patrol including four years on the SRT, Agent Lira had ten years of experience with the Border Patrol including nine years on the SRT, Agent Lara had seven years of experience with the Border Patrol including four years on the SRT, and Agent Buyer had eight years of experience with the Border Patrol, all of which were spent on the SRT.

[2] Seven illegal aliens had already died from dehydration and exposure in the surrounding area that summer. Members of the SRT also previously discovered twenty-six illegal aliens locked in a one bedroom apartment, several of whom needed immediate medical attention.

The agents followed the tracks for about four or five miles and arrived at the town of Bruni, Texas, after midnight. Agent Villarreal testified that as the tracks drew near to Bruni, the footprints became more scuffed and had less pronounced toe indentations than at first, which indicated that the individuals were fatigued. Agent Villarreal also testified that the temperature that night was in the nineties.

The agents continued to follow the tracks to a house, later discovered to be Troop's house, in Bruni. The house was surrounded by a barbed wire fence with a gate in it. At the time the agents arrived, the gate was open, leaving a fourteen-foot gap in the fence. The tracks led through the gate and into the house through what the agents believed was the back door. Agent Villarreal passed through the gate and approached the door. He knocked and announced himself as a Border Patrol agent several times, but no one inside the house responded. Agent Buyer and Orlando Miranda ("Agent Miranda") went to the front of the house, knocked on that door, and announced, "Open up, Border Patrol." Again, they received no response.[3]

Agents Lira and Lara then walked around the north side of the house to see if the suspects had left the house and to keep any suspects from leaving. There, they came upon a window to a bedroom. By shining his flashlight through the window, Agent Lira was able to see two men lying on a bed, apparently asleep, and fully dressed. There was conflicting testimony as to whether the bedroom window was open, with the agents claiming that it was, and Luis Ernesto Yanez-Duranzo ("Duranzo"), one of the men on the bed, asserting that it was closed. The district court did not resolve this issue at the suppression hearing.

---

[3] It was later determined that the "back" door was the only functional door in the house.

Agents Lira and Lara shouted, "Wake up, Border Patrol" at the men, but received no response. Agent Lira testified that he then reached through the window and grabbed the foot of one of the men on the bed and shook it. The man did not respond. Agent Lara, however, testified that the bed was six feet away from the window, which would make Agent Lira's statement implausible. Duranzo also said that no one shook his legs or the legs of the other man on the bed. The district court did not resolve this issue either.

Agent Lira decided to enter the house to make sure the men were all right, and both Agents Lira and Lara climbed through the bedroom window. Upon entry, Agents Lira and Lara found two other men lying on the floor in addition to the two on the bed. None of the men needed any medical assistance. Agents Lira and Lara then let the other agents into the house. The illegal aliens and Troop, who was sleeping in another room, were eventually arrested.

On August 16, 2005, the Government charged Troop with conspiring to transport an alien in violation of 8 U.S.C. § 1324. Troop filed a motion to suppress on September 6, 2005, arguing that the agents' warrantless search of the curtilage of his house and entry into his house violated the Fourth Amendment. The district court initially denied the motion, but, following a motion to reconsider, the district court held a suppression hearing on October 21 and 24, 2005. The district court then entered a written order denying the motion, reasoning that the possibility that the suspected aliens were in need of medical attention created exigent circumstances sufficient to justify the warrantless entry into Troop's house. See Dist. Ct. Op. at 8 ("[I]t would have been unreasonable to require the agents to obtain a search warrant and risk the death of an alien during the time it would take to procure a warrant.").

The district court tried Troop on stipulated facts, found him guilty, sentenced him to twenty months in prison to be followed by a three-year term of supervised release, and imposed a $500 fine and a $100 special assessment.

Troop has appealed the district court's ruling on his motion to suppress. We have jurisdiction over Troop's appeal as a final judgment has been entered. See 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

When considering the denial of a motion to suppress, this court reviews the district court's factual findings for clear error and its Fourth Amendment conclusions de novo. United States v. Martinez, 486 F.3d 855, 859 (5th Cir. 2007). Whether exigent circumstances that justify a warrantless search exist is a fact finding that is reviewed for clear error. United States v. Blount, 123 F.3d 831, 837 (5th Cir. 1997). We view the evidence introduced at a suppression hearing in the light most favorable to the prevailing party. United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir. 2003).

## III. DISCUSSION

It is well-established that "[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." United States v. Gomez-Moreno, 479 F.3d 350, 354 (5th Cir. 2007). The Supreme Court has held that the need to assist persons who are seriously injured or threatened with such injury is an exigency that obviates the need for a warrant. Brigham City v. Stuart, 126 S. Ct. 1943, 1947 (2006) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (internal quotation marks omitted)). Consequently, law enforcement officers may enter a home without a warrant in order to render emergency assistance to an injured occupant. Id.

The Government bears the burden of demonstrating exigent circumstances. Gomez-Moreno, 479 F.3d at 354. In this case, the Government argues that exigent circumstances existed because the suspected aliens might have needed immediate medical attention. As evidence that the aliens may have

been in physical distress, the Government points to the high temperatures that night, the evidence that the suspected aliens were fatigued, and the failure of anyone inside Troop's house to respond when the agents knocked on the door and window. After review of the evidence and testimony presented at the suppression hearing, we do not agree that this evidence permits a finding of exigent circumstances.

"Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry." United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001) (internal quotation marks omitted). However, the court must view the circumstances objectively and set aside any of the agents' subjective motivations. See Brigham City, 126 S. Ct. at 1948. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Id.; see also United States v. Rodea, 102 F.3d 1401, 1405 (5th Cir. 1996) (stating that the court should "consider the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers" (internal quotation marks omitted)). Thus, we consider whether the evidence presented at the suppression hearing and relied upon by the Government would objectively indicate to a reasonable agent that the suspected aliens were in physical distress such that a warrantless entry into Troop's house or its curtilage was permitted by the Fourth Amendment.

As noted above, the Government points to the fact that the aliens walked some distance in ninety-degree heat and showed signs of fatigue at the end of their journey as evidence of physical distress. This alone is insufficient to demonstrate exigent circumstances requiring an immediate entry into the house. To hold otherwise would permit warrantless entries into homes in which an occupant had recently taken a long walk in the Texas summer and become tired

as a result. The Fourth Amendment requires more. See Mincey v. Arizona, 437 U.S. 385, 392 (1978) (noting that the exigent circumstances exception to the warrant requirement applies when officers "reasonably believe that a person . . . is in need of immediate aid" (emphasis added)). In this case, there was no evidence of medical distress requiring immediate aid, such as loss of blood, signs of physical illness, or evidence that an individual had to be carried or dragged. The Government also did not present any evidence of what type of medical distress is typically produced by a four-mile walk in the heat at night, which might have indicated that it was probable that the suspected aliens needed aid. Absent any such evidence, it was unreasonable for the agents to conclude that the suspected aliens likely needed immediate aid based solely on the fact that the aliens showed fatigue.

Without any objective evidence of physical distress, the failure of anyone to respond to the agents' knocking at the front and back doors of Troop's house also becomes insufficient to create exigent circumstances. Indeed, it is hardly surprising that the aliens chose not to answer the door, given that Border Patrol agents were waiting to arrest them on the other side. See Dist. Ct. Op. at 6 (noting that, had the aliens answered the door, they "would most assuredly have been arrested"). Again, had there been signs of medical distress beyond simple tiredness, this analysis might have turned out differently. As it stands, though, it was not reasonable to assume that the aliens needed immediate medical attention based on their failure to respond to the officers' knocks and calls.

The Government asserts that the agents were attempting a "knock and talk" strategy that is permitted under Fifth Circuit precedent. It is true that our precedent holds that the knock and talk strategy is a "reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." Jones, 239 F.3d at 720. However, we have also held that when no one answers the door, the officers should end the knock

7

and talk and "change[] their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." Gomez-Moreno, 479 F.3d at 356. In the instant case, rather then changing their strategy when no one responded to the knocks on the door, the agents proceeded to conduct a warrantless search of the curtilage of Troop's house, going so far as to reach inside the window and grab an occupant.[4]  Gomez-Moreno counsels us that such conduct is not permitted under the Fourth Amendment.

Although we are reluctant to second guess the actions of law enforcement, it is telling that in this case Agent Lira was the only agent to actually testify that he was concerned for the well-being of the suspected aliens—and that concern did not arise until Agent Lira reached in a window and grabbed a suspected alien, which was after the search had already exceeded the bounds of the Fourth Amendment.  None of the other agents ever stated that they had a concern that the suspected aliens might need immediate aid.  While the subjective motivations of the agents are not controlling, see Brigham City, 126 S. Ct. at 1948, it does give us pause that none of these men, who are trained to locate and aid aliens in need of help, appear to have believed that these aliens were in need of assistance based on the evidence of fatigue and failure to respond to knocks at the front and back doors.

In sum, the evidence in this case that the suspected aliens were tired and did not answer the door does not add up to a reasonable belief that the suspected aliens were in need of immediate medical aid.  Consequently, there were no exigent circumstances that permitted the warrantless entry into Troop's house, and the district court clearly erred in concluding otherwise.  Therefore, we must reverse the district court's ruling on Troop's motion to suppress.

---

[4] Agent Lira, who claims to have grabbed an individual through the bedroom window, testified that, at that time, he believed the individual was "playing possum."  Agent Lira did not testify that the individual exhibited any signs of physical distress, such as blood loss, labored breathing, or other symptoms of injury or illness.

## IV. CONCLUSION

Because the agents' warrantless search of Troop's home was not permitted under the Fourth Amendment, we REVERSE the district court's ruling on Troop's motion to suppress, VACATE Troop's conviction, and REMAND for further proceedings consistent with this opinion.

REVERSED, VACATED, and REMANDED.