**UNITED STATES of America**

v.

**Arturo VARELA–DELGADO and Grace Hernandez–Mendiola, Defendants.**

**No. EP–07–CR–2440–PRM.**

United States District Court, W.D. Texas, El Paso Division.

April 14, 2008.

Ruben Morales, Attorney at Law, El Paso, TX, for Arturo Varela–Delgado and Grace Hernandez–Mendiola.

Adrian Enrique Gallegos, U.S. Attorney's Office, El Paso, TX, for United States of America.

*MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT GRACE HERNANDEZ–MENDIOLA'S MOTION TO SUPPRESS AND GRANTING IN PART DEFENDANT ARTURO VARELA–DELGADO'S MOTION TO SUPPRESS*

PHILIP R. MARTINEZ, District Judge.

On this day, the Court considered Defendant Grace Hernandez–Mendiola's ("Hernandez") "Motion to Suppress Evidence and Statements and Supporting Memorandum," filed on November 14, 2007; Defendant Arturo Varela–Delgado's ("Varela") "Motion and Brief to Suppress Evidence," filed on November 15, 2007; the United States of America's "Response to Defendants' Motions to Suppress," filed on December 7, 2007; Varela's "Response to Governments Brief [sic]," filed on December 14, 2007; and Hernandez's "Response to Government's Brief," filed on December 20, 2007, in the above-captioned cause.

On January 11 and 14, 2008, the Court held a hearing to consider the Motions. Both Defendants and their counsel of record were present. At the hearing, the Government presented the testimony of four witnesses: Immigrations and Customs Enforcement ("ICE") Special Agent Tom Gronewold ("Gronewold"), United States Border Patrol ("USBP") Agent Nolan Blanchette ("Blanchette"), ICE Special Agent Ricardo Cardoza ("Cardoza") and ICE Senior Special Agent Louis Gomez ("Gomez"). Varela elected not to testify and did not call any witnesses. Hernandez did testify and also called Gabriel Mendiola, her son, as a witness. After careful consideration of the briefs and the evidence presented at the hearing, the Court is of the opinion that Hernandez's Motion to Suppress should be granted, and Varela's Motion to Suppress should be granted

in part and denied in part for the reasons that follow.

## I. FINDINGS OF FACT [1]

On August 30, 2007, Border Enforcement Security Task Force ("BEST") agents, including Gomez, responded to the USBP checkpoint in Sierra Blanca, Texas, in the Western District of Texas, to investigate the discovery of nearly 1,700 pounds of marijuana in a tractor-trailer attempting to pass through the checkpoint. A vehicle registration search identified Leonor Ramirez ("Ramirez") as the owner of the tractor-trailer and listed her address as 1861 Joe Battle # 2, El Paso, Texas. Gomez contacted agents Gronewold and Blanchette and instructed them to locate Ramirez. The agents went to the Joe Battle address, which housed a tax service business, "Taxrite." The owner of Taxrite explained to the agents that Ramirez was his client and that she resided at 2028 Pueblo Nuevo in El Paso.

Both agents then proceeded to 2028 Pueblo Nuevo and observed individuals moving furniture into the house. The front doors to the residence were open. Gronewold and Blanchette approached the threshold of the house where they eventually encountered Hernandez. They identified themselves to her as law enforcement agents. Gronewold told Hernandez that they were looking for Ramirez, and asked Hernandez if she knew where Ramirez could be found. Hernandez denied knowing Ramirez. Gronewold then asked Hernandez about the home owner. Hernandez told both agents that she had recently purchased the house, and was in the process of moving in. However, she could not identify the party from whom she purchased the house.[2] Gronewold then asked Hernandez for permission to search the residence, which request Hernandez denied.[3] Both Gronewold and Blanchette testified that they heard Hernandez's voice quiver and saw her hands shake which conduct indicated nervousness to them. While standing at the front door, the agents also noticed a portrait located just inside the front door which they recognized as one of Jesus Malverde, who they indicated is the patron saint of narcotic smugglers. They also observed a man, later identified as Varela, standing at the back of house looking toward the front door. Hernandez indicated that Varela was her uncle.

Concluding Hernandez would not be of any assistance in their search for Ramirez, Gronewold and Blanchette ended their conversation with Hernandez and began to leave the residence. As they were leaving, they decided to request that a vehicle registration query be run to identify the registered owners of the two vehicles parked in the driveway. They discovered that "Leonor Ramirez" and "Sandra Leonor Ramirez" were listed as owners of the vehi-

---

**1.** The Court notes its responsibility to evaluate the credibility of the witnesses and make factual determinations. As often occurs at evidentiary hearings, the witnesses presented conflicting factual scenarios. For the most part, the Court need not resolve these factual disputes in order to address the pending Motions. Where appropriate, the Court will note whether or not it found certain disputed factual allegations to be credible.

**2.** Hernandez testified Gronewold did not question her regarding the party from whom

she purchased the house. The Court credits Gronewold's testimony on this issue.

**3.** Gronewold and Blanchette both testified that neither of them sought Hernandez's permission to search the residence during this initial encounter. The Court credits Hernandez's testimony, given Gronewold's testimony that the whole purpose of talking to Hernandez was to get consent to search the residence.

cles.[4] The agents also learned that one of the vehicles, the Chevrolet Avalanche, had crossed into the United States from Mexico a few days earlier.[5] Based on the portrait of Jesus Malverde, signs of Hernandez's nervousness, and the recent border crossing history of the Chevrolet Avalanche, both agents suspected drugs could be located inside the house.

Less than two minutes after concluding their initial conversation with Hernandez, Gronewold and Blanchette again approached the house, this time seeking to resolve what they believed to be inconsistencies in Hernandez's statements concerning her relationship with Ramirez.[6] Since the front door was closed, the agents knocked on the door and Hernandez answered. When asked why vehicles registered to Ramirez were parked in her driveway, Hernandez explained that the vehicles belonged to her friend "Sandra Ramirez." She also indicated that she had purchased the house from "Sandra Ramirez," and that "Sandra Ramirez" had left the vehicles while she was settling into her new home. Finally, Hernandez denied knowing how to contact Ramirez. Gronewold asked Hernandez if there was a vehicle in the enclosed garage, and Hernandez responded in the negative. She told the agents that her son had taken her personal vehicle to school that day. Gronewold again asked Hernandez if he could search her house to look for illegal aliens.[7] Hernandez again denied this request, and denied that illegal aliens were in the house. She told the agents they would need a warrant if they wanted to search her house. Gronewold then asked Hernandez for identification, and she retrieved her Texas driver's license from inside the house. When Hernandez handed Gronewold her license, he noticed more pronounced shaking in her hands.

While the agents were verifying Hernandez's identification, they heard what sounded like a backdoor or gate located in the rear of the property open and close. Gronewold testified that he became concerned for his safety and directed Blanchette to watch his flank. They came upon Varela, who was walking in their direction toward the front of the house. The agents made eye contact with Varela, who continued walking toward them and did not attempt to flee or otherwise alter his path. Gronewold greeted Varela in English, but Varela did not respond. The agents surmised Varela likely did not understand English and decided to communi-

---

**4.** Hernandez testified that "Leonor Ramirez" is the mother of "Sandra Leonor Ramirez" and that she is acquainted only with Sandra Ramirez. Gronewold and Blanchette testified that at the time, they believed both names referred to the same person.

**5.** The Government submits that a dispatch operator provided the agents with information from the Treasury Enforcement and Communication System ("TECS"). Govt's Resp. 3. The TECS is "a communication system permitting message transmittal between Treasury law enforcement offices and other Federal, national, state, and local law enforcement agencies." I.R.S. § 9.10.2 (2001). The TECS is "designed to identify individuals and businesses suspected of, or involved in violation of federal law." *Id.*

**6.** Hernandez testified that the agents also approached her residence some time between these two exchanges, for a total of three discussions. The Court credits the testimony of Gronewold and Blanchette, who both testified they did not approach the house between the two exchanges discussed, given Hernandez's characterization of the second encounter which would have allowed for the possible destruction of narcotics if access was denied.

**7.** Gronewold testified that he purposely did not inform Hernandez that he suspected drugs were in the house because he feared such information could lead to the destruction of evidence.

cate with him in Spanish. In Spanish, Blanchette identified himself and Gronewold as law enforcement officers. Varela then greeted the agents in Spanish. Blanchette then asked Varela whether he was a United States citizen. Varela responded that he was from Puerto Rico and had a work *"permiso"* which authorized his presence in the United States. Aware that Puerto Ricans are citizens of the United States and do not need such documentation to be lawfully in the United States, Blanchette asked Varela for identification. Varela, appearing to be nervous, could not produce any form of identification nor could he provide a name that could be verified. The agents suspected Varela was illegally in the United States, and decided to transport him to the Yselta Border Patrol station in order to determine his immigration status. Before departing with Varela, the agents accompanied him to the front door of the residence so that he could leave certain personal belongings at the house. Varela knocked on the front door, but nobody answered. Then, using his personal cellular phone, Varela called Hernandez and informed her that Gronewold and Blanchette were taking him to the Border Patrol station.

Gronewold and Blanchette then transported Varela to the Border Patrol station. When Gronewold and Blanchette left 2028 Pueblo Nuevo with Varela, Gomez instructed Cardoza and Senior Special Agent Andres Maldonado ("Maldonado") to go to the house to conduct surveillance. Cardoza and Maldonado arrived at the residence in separate vehicles and began surveillance.

Varela, who was not handcuffed, rode in Gronewold's vehicle and sat in the front passenger seat. At the Border Patrol station, the agents determined that Varela was a citizen of Mexico and was illegally in the United States. Determining that probable cause existed to believe Varela was in violation of the law, Blanchette advised Varela of his *Miranda* rights in Spanish and arrested him. Blanchette then reported Varela's immigration status to Gomez.

During their surveillance, Cardoza and Maldonado observed a white sedan pull into the driveway of 2028 Pueblo Nuevo. A teenage boy and girl (later determined to be Hernandez's children) exited the vehicle and entered the house. Shortly thereafter, Hernandez, the two teenagers, and two other younger children exited the residence, entered the vehicle (later determined to be Hernandez's vehicle), and left the residence.[8] Approximately two to three minutes later, Cardoza pursued Hernandez's vehicle and activated emergency lights in order to stop the vehicle. Hernandez complied. Immediately thereafter, Gomez, traveling in his police vehicle with Agent Freddie Vasquez ("Vasquez"), arrived on the scene. Both Gomez and Cardoza testified that the purpose of the stop was to identify the occupants of the vehicle and verify their citizenship.[9]

At least two law enforcement vehicles were present at the stop; Gomez's vehicle was positioned in front of Hernandez's vehicle, and Cardoza's vehicle was behind it. Gomez approached the driver's side window of Hernandez's vehicle and requested identification, which she produced.[10] He

---

8. Cardoza only noticed two of the four children enter the vehicle when it left the residence.

9. There is no evidence that Hernandez committed any traffic violation.

10. Gomez testified that he approached Hernandez's vehicle and spoke with her. Hernandez testified that Gomez was not present at the stop. The Court credits Gomez's testimony.

observed four children in the vehicle. Hernandez informed Gomez that the four individuals in the vehicle were her children and that each was a United States citizen. Gomez did not inquire further as to the names, ages, or residency status of the children. He asked Hernandez to step outside the vehicle and she complied. He then asked Hernandez for permission to search her house, which she denied.[11]

Cardoza, situated behind Hernandez's vehicle, instructed her to step toward him.[12] Without making any reference to the stated purpose of the stop,[13] he asked Hernandez for permission to search 2028 Pueblo Nuevo. When she again refused, Cardoza informed Hernandez that the agents were in the process of seeking a search warrant, and would search her house with or without her consent. Specifically, he told her house would be searched "por las buenas o por las malas,"[14] which she understood to mean that agents would search her house without regard for the legality of the search. Hernandez again refused to consent. Cardoza yet again sought permission to search the residence, and communicated that if a search warrant for the residence was obtained, and if contraband was discovered therein, Hernan-

dez would be held responsible for all contraband seized. Hernandez was never handcuffed nor physically threatened. Moreover, she was never advised of her right to refuse to consent. Eventually, Hernandez orally consented to a search of her residence. In response to Gomez's continuing inquiry, Hernandez admitted that the drugs would be found in the garage.

Hernandez was then taken back to 2028 Pueblo Nuevo in Cardoza's vehicle. Upon return to the residence, Hernandez unlocked the front door to the house, allowing the search to proceed. Cardoza then directed Hernandez to sit in his vehicle and first presented her with a "Consent to Search Premise" form.[15] Hernandez testified that she could not remember reading or signing the form, but admitted that her signature appears on the document. While Hernandez was seated in Cardoza's vehicle, and while the search was underway, Gomez and Cardoza collected biographical information from Hernandez. During their exchange, Hernandez stated Varela was her boyfriend and admitted that she had lied when she told Gronewold and Blanchette that Varela was her uncle. At this point, the agents advised Hernan-

---

**11.** According to the testimony of Gabriel Mendiola, Vasquez approached the passenger side window, where Gabriel was seated, and requested Gabriel hand him Hernandez's purse, with which request Gabriel complied.

**12.** Cardoza testified that this exchange took place on the sidewalk while Hernandez maintains it took place in the street. The Court not need resolve this dispute as it has no bearing on the instant Motions.

**13.** As noted *supra*, Cardoza testified that he stopped Hernandez in order to identify the occupants of the vehicle and verify their citizenship. Cardoza, on direct examination, denied contact with any of the vehicle's occupants until he spoke with Hernandez. It was only on cross-examination that Cardoza con-

veniently recalled asking Hernandez if she was able to speak English and if she was an American citizen. Given the agents' persistent interest in searching the residence, the Court does not credit Cardoza's testimony about his pretextual basis for the stop.

**14.** "Por las buenas o por las malas" is a Spanish idiom which literally translates to "for good or for evil." Its meaning is similar to that of the English idioms "come hell or high water," and "by hook or by crook."

**15.** Gronewold testified that Hernandez was provided with, and signed, a "Consent to Search Premise" form while she stood outside the house. The Court credits Hernandez's testimony on this issue since it is consistent with the testimony of other witnesses.

dez of her *Miranda* rights, and asked her to sign a "Statement of Rights" form.[16] Hernandez initially refused to sign the "Statement of Rights" form because she did not agree to the waiver of rights provision, and told the agents she wanted to speak with an attorney. Despite her refusal, the agents again asked Hernandez to sign the form. At some point, either Gomez or Cardoza crossed out the waiver provision, and Hernandez signed the document. The agents ceased questioning Hernandez and escorted her into a first floor room in the house, where she remained until the search was concluded.

In the meantime, Gomez telephoned Blanchette, who was traveling with Gronewold and Varela to the Border Patrol headquarters for further processing. Gomez informed Blanchette that the residence "was good." Gomez also instructed Blanchette to return Varela to 2028 Pueblo Nuevo for further questioning rather than taking him to the Border Patrol headquarters. Blanchette conveyed this information to Gronewold. Blanchette and Gomez both testified that they understood Gomez's communication to mean that agents at the residence suspected that there were drugs inside the house. It is unclear whether they knew that Hernandez had consented to the search. At the time, the agents did not tell Varela the purpose of their return to 2028 Pueblo Nuevo. En route to the residence, Blanchette again advised Varela of his *Miranda* rights in Spanish. Once at the residence, Varela remained outside of the house while the search was taking place.

Five to eight agents and at least one drug-sniffing dog conducted the search. Gronewold searched the garage and came upon a Toyota 4Runner parked therein. A search of the vehicle revealed wrapped bundles of a green leafy substance. Agents discovered similar bundles in a furnace closet and a pantry located inside the residence. In total, 753 bundles of marijuana were discovered. The search also revealed a .22 caliber pistol in an upstairs bedroom along with .22 caliber ammunition. The agents also found $1,182 in Hernandez's purse.[17]

On September 26, 2007, a Grand Jury returned a three-count indictment charging Hernandez and Varela with (1) conspiracy to possess marijuana, (2) possession with intent to distribute marijuana, and (3) maintaining a drug-involved premise. On November 14, 2007, Hernandez filed a motion seeking to suppress statements made during the traffic stop and all of the evidence seized from the search of

---

**16.** The "Statement of Rights" form provided to Hernandez set forth the *Miranda* rights. It also contained a provision which provided, in part, "I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily."

**17.** In its pleadings, the Government alleges that agents confronted Varela with regard to the items they had found at the residence and that Varela explained "that he found the marijuana in an abandoned vehicle on Yarborough Blvd." Resp. 8. It also alleges that "Varela claimed ownership of the handgun." *Id.* None of the witnesses testified that Varela made any incriminating statements, and there is no evidence before the

Court to suggest as much. In addition, subsequent to the suppression hearing, the Court found that a potential conflict of interest existed regarding Attorney Russell Aboud's representation of Varela and ordered Attorney Aboud to withdraw as counsel. *See* Docket No. 61. Attorney Aboud subsequently withdrew, and Attorney Ben Ivey entered an appearance as counsel for Varela. Given the lack of testimony regarding any statements and/or admissions made by Varela as well as the substitution of counsel, the Court is of the opinion that a hearing should be held to consider whether any incriminating statements Varela allegedly made should be suppressed.

2028 Pueblo Nuevo. On November 15, 2007, Varela filed a motion seeking to suppress statements he made following his arrest as well as all of the evidence seized from 2028 Pueblo Nuevo.

## II. LEGAL STANDARD

■ The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *United States v. Gomez–Moreno*, 479 F.3d 350, 354 (5th Cir.2007). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " *Brigham City v. Stuart*, 547 U.S. 398, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)) (both alterations in original).

■ The proponent of a motion to suppress evidence bears the burden of proving, by a preponderance of the evidence, that the challenged evidence was obtained in violation of his or her constitutional rights. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir.2005). If a person's Fourth Amendment rights have been violated, the exclusionary rule provides that any evidence obtained from the violation is inadmissible as evidence at trial and must be suppressed unless "the nexus between the illegal police activity and attainment of the evidence is sufficiently attenuated so that the taint resulting from the misconduct is dissipated." *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir.1990).

## III. ANALYSIS

### A. The agents lacked reasonable suspicion to stop Hernandez and her vehicle.

Hernandez argues that the agents lacked reasonable suspicion to stop her person and vehicle. The Government responds that the agents lawfully stopped Hernandez because they sought to verify the immigration status of the vehicle's occupants.

■ The protection of the Fourth Amendment extends beyond the home, out to the sidewalk, and even into a person's automobile. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) ("[P]eople are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles."). A traffic stop is a seizure within the meaning of the Fourth Amendment even where "the purpose of the stop is limited and the resulting detention is quite brief." *Id.* at 653, 99 S.Ct. 1391. A traffic stop complies with the Fourth Amendment if (1) the stop is justified at its inception, and (2) "the officer's subsequent actions [are] reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir.2004).

■ "A traffic stop is justified at its inception if an officer has objectively reasonable suspicion that some sort of illegal activity ... occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir.2005). In making a reasonable suspicion inquiry, a court must "consider the facts and circumstances of each case,

giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers ... were reasonable under the circumstances." *Brigham,* 382 F.3d at 507.

 "[W]hen an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The reasonableness of stopping a vehicle to determine if undocumented aliens are traveling therein may depend on the following factors:

(1) known characteristics of a particular area, (2) previous experience of the arresting agents with criminal activity, (3) proximity of the area to the border, (4) usual traffic patterns of that road, (5) information about recent illegal trafficking in aliens or narcotics in the area, (6) the behavior of the vehicle's driver, (7) the appearance of the vehicle, and (8) the number, appearance and behavior of the passengers.

*United States v. Espinosa–Alvarado,* 302 F.3d 304, 306 (5th Cir.2002) (quoting *United States v. Inocencio,* 40 F.3d 716, 722 (5th Cir.1995)).

 In the instant action, there is no evidence that the area in the vicinity of Hernandez's residence is known for activity involving alien smuggling. Hernandez had just left her house and was not making her way from the direction of the border. There is no evidence that illegal trafficking in aliens or narcotics had occurred recently

in the area. *Compare United States v. Nichols,* 142 F.3d 857, 865–66 (5th Cir. 1998) (finding it reasonable to stop a vehicle coming from the direction of the border and traveling in an area known for alien smuggling based on suspicions of alien smuggling). Additionally, there is no evidence that Hernandez violated any traffic laws, or that her vehicle had been modified in a visible manner or bore other indicia of smuggling. Finally, there is no evidence that any of Hernandez's children were illegal aliens.

In fact, the only evidence of an immigration violation with any connection to Hernandez relates to Varela's unlawful presence in the United States. However, this fact alone does not justify stopping and extensively detaining Hernandez because Varela had already been detained, and there was no evidence at the time that Hernandez knew of Varela's illegal status. While courts are "reluctant to second guess the actions of law enforcement," it is telling that neither Gomez nor Cardoza attempted to confirm Hernandez's contention that the children were hers or that they were all United States citizens. *See United States v. Troop,* 514 F.3d 405, 410–11 (5th Cir.2008) (finding a search of a house unreasonable and noting that none of the agents appeared to believe reasonable grounds existed to justify the intrusion). The agents' inaction in this respect suggests to the Court that Hernandez was stopped for the sole purpose of obtaining her consent to search 2028 Pueblo Nuevo.[18] Upon review of all the facts and circumstances known to the agents prior to the stop, the Court finds no objective basis to constitute reasonable suspicion that any of the occupants in Hernandez's vehicle were

**18.** The Court finds it odd that the stated purpose of stop—identifying the citizenship of the occupants of the vehicle—was addressed and dismissed immediately after Gomez approached the vehicle. Once the agents dispelled their initial suspicion, the reason for the stop ceased to exist and the agents lacked any reason to continue to detain Hernandez. The Court finds that the agents' persistent efforts to secure consent to search the residence undercut their professed concern of verifying citizenship.

illegal aliens, or that Hernandez or her children were otherwise connected with alien smuggling or harboring. Thus, the Court concludes that the stop of Hernandez's vehicle occurred in violation of the Fourth Amendment.

### B. Hernandez did not validly consent to the search of her residence.

Having determined that Hernandez was illegally stopped, the Court turns to consider whether she knowingly and voluntarily consented to a search of her residence. It is undisputed that 2028 Pueblo Nuevo was searched without a warrant and based solely on the oral consent given by Hernandez during the traffic stop. Hernandez argues that her oral consent was not freely and voluntarily given because she consented in the face of coercive tactics by the agents, or, alternatively, her consent was tainted by the illegal traffic stop. The Government argues that Hernandez validly consented to the search because she was aware of her right to refuse consent,[19] having eventually signed a "Consent to Search Premise" form, and having opened the front door of the house in order for the agents to proceed with the search.

■ "[W]here a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *Waldrop*, 404 F.3d at 368. "Consent is valid only if it is voluntary." *Gomez–Moreno*, 479 F.3d at 357. "[I]f an individual gives consent after being subject to an initial unconstitutional search, the consent is valid only if it was an independent act of free will, breaking the causal chain between the consent and the constitutional violation." *Id.* (quoting *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir.2002)). Consent given after an

initial unconstitutional search must be both voluntary and "an independent act of free will." *United States v. Jones*, 234 F.3d 234, 242 (5th Cir.2000).

"To determine whether consent was voluntarily given, the court uses a six factor test: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his [or her] right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found."

*Hernandez*, 279 F.3d at 307.

■ "To determine whether the defendant's consent was an independent act of free will, breaking the causal chain between the consent and the constitutional violation and the consent, [a court] consider[s] three factors: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *Id.*

■ In the instant case, even if the Court were to assume Hernandez voluntarily consented to the search of her house, the Court concludes her consent was not an independent act of free will based on the three factors set forth above.

First, Hernandez orally consented during the pendency of the illegal stop. The Fifth Circuit found a close temporal proximity between illegal conduct and a defendant's consent such that the causal chain was not broken where a defendant consented to a search during the course of an unlawful traffic stop and was detained until such consent was given. *Jones*, 234 F.3d at 243; *United States v. Dortch*, 199

---

**19.** There is no evidence that Gomez, Cardoza, or any other agents, informed Hernandez of her right to refuse consent. Rather, the Government suggests that her prior refusals are evidence of her knowledge.

F.3d 193, 202 (5th Cir.1999). Additionally, in *Gomez–Moreno,* the Fifth Circuit found that the defendant's consent to search was not an independent act of free will "given the closeness in time between the initial unconstitutional raid and the consent [the defendant] gave," which period of time was approximately forty-five minutes. *Gomez–Moreno,* 479 F.3d at 358. In the instant case, as in *Jones* and *Dortch,* the agents stopped Hernandez absent legal justification and detained her until she consented to a search of her house. Thus, the Court finds this factor indicates there was no break in the causal connection between the illegal stop and Hernandez's consent to search 2028 Pueblo Nuevo.

Second, no circumstances intervened between the detention and the consent from which the Court might infer Hernandez freely gave consent. Federal courts have found sufficient intervening circumstances where officers obtained unsolicited permission to search or the defendant had been informed of his right to refuse to consent to a search. *See, e.g., United States v. Mendoza–Salgado,* 964 F.2d 993 (10th Cir. 1992) (consent freely given where the defendant's wife gave unsolicited permission to search their home); *Bretti v. Wainwright,* 439 F.2d 1042 (5th Cir.1971) (consent freely given where the defendant consented after officers informed him of his right to refuse consent). On the other hand, in *Jones,* the Fifth Circuit found "no circumstances intervened between the detention and the consent and there is no reason to think that [the defendant] believed he was free to go during that time." *Jones,* 234 F.3d at 243. In *Jones,* the defendant consented during the course of an illegal traffic stop while an officer retained his license, and the defendant was never told he could leave. *Id.*

In the instant action, as in *Jones,* Cardoza solicited Hernandez's consent during an illegal stop under circumstances in which a reasonable person in Hernandez's position would not have felt free to leave. Hernandez had been pulled over by a group of USBP agents shortly after leaving her house. Her vehicle was surrounded by at least two government vehicles, and the agents conducted an interrogation in an apparent show of authority. Gomez directed Hernandez to step outside of her vehicle and produce identification, with which direction she complied. She was questioned by two different agents, initially refused both agents' requests to search her residence, and then was questioned again. In addition, neither agent informed Hernandez that she could leave, nor did they inform her of the right to refuse to consent to a search of her house. Thus, the Court finds no intervening circumstances occurred from which to infer Hernandez freely gave consent.

Finally, the agents flagrantly violated Hernandez's rights when they initiated the traffic stop absent reasonable suspicion, and after she had repeatedly refused to consent to a search of her house. The Fifth Circuit has found flagrant conduct when officers stop a defendant in violation of the Fourth Amendment. *See, e.g., United States v. Miller,* 146 F.3d 274, 280 (5th Cir.1998) (stopping a suspect without probable cause found to be flagrant behavior); *United States v. Causey,* 818 F.2d 354, 361 (5th Cir.1987) (finding arrest made absent probable cause "amounted to a flagrantly abusive violation of Fourth Amendment rights.").

In the instant action, not only was Hernandez stopped in violation of the Fourth Amendment, but it also appears that she was stopped for the sole purpose of obtaining consent to search her house. The Fifth Circuit has consistently held that an officer's intent to detain a defendant until he or she consents weighs in favor of finding consent invalid. *See Jones,* 234 F.3d at 243 (officers unlawfully exceeded a

traffic stop for the "clear" purpose of obtaining consent to search the vehicle for drugs); *Dortch*, 199 F.3d at 202 (officers "intended all along" to detain the defendant until he consented to a search). Here, the agents continued to detain Hernandez after she repeatedly refused to consent. Cardoza indicated that her house would be searched "por las buenas o por las malas." It appears to the Court that the agents intended to search the residence regardless of whether or not Hernandez give valid consent. Accordingly, the third factor supports a finding that the causal connection between the illegal stop and Hernandez's consent was not broken.

The Court, after considering the testimony presented, also finds that Cardoza's presence and demeanor leads to a conclusion that Hernandez's consent was not an independent act of free will. Cardoza is a physically imposing figure. When compared to Hernandez, who is diminutive in stature, it seems likely that she would feel intimated by his presence. Hernandez referred to the size disparity between Cardoza and herself, stating "[Cardoza] is a big guy. I'm a female, you know," and asserting that she "did feel threatened and scared" during the traffic stop. Moreover, the tone and inflection of Cardoza's voice during his testimony demonstrates to the Court his ability to command attention and the likelihood that Hernandez felt intimidated.

Thus, the Court finds that Hernandez's consent to a search of her house was not an independent act of free will, that her consent was invalid and that, consequently, the search of 2028 Pueblo Nuevo violated the Fourth Amendment.[20] Accordingly, all evidence seized as a result of the search must be suppressed with respect to both Hernandez and Varela.[21]

## C. Whether any incriminating statements made by Varela should be suppressed

As indicated in note 16, further factual development is necessary in order to resolve whether any incriminating statements made by Varela should be suppressed. Accordingly, the Court reserves a ruling on his Motion insofar as he seeks to suppress such statements pending an evidentiary hearing on the matter.

## IV. CONCLUSION

Because the Court has found that Hernandez was stopped in violation of the Fourth Amendment and that her consent to a search of her house was not given freely, it concludes that her Motion to Suppress should be granted. Accordingly, any statements made by Hernandez during the stop and any evidence seized from her residence are suppressed.

Having concluded that all of the evidence seized from 2028 Pueblo Nuevo must be suppressed, the Court finds Vare-

---

**20.** Similarly, the Court concludes that any statements made by Hernandez during the stop must be suppressed as the fruit of a Fourth Amendment violation. As discussed *supra*, no intervening events took place between the unlawful stop and the time Hernandez made any statements, and the agents flagrantly disregarded Hernandez's rights by initiating the stop absent reasonable suspicion. Moreover, there is no evidence that Hernandez's statements would have been obtained absent the illegal stop. The Court concludes that any statements made by Hernandez during the stop must be suppressed.

**21.** The Government does not contest Varela's standing to challenge the search of 2028 Pueblo Nuevo. The Court finds Varela has standing to challenge any evidence seized as a result of Hernandez's consent to search the residence because Varela and Hernandez have a common law marriage and Varela was apparently co-owner of the residence. Thus, the Court finds it appropriate to suppress all of the evidence obtained from the search of the house from being used as against either Hernandez or Varela.

la's Motion to Suppress should be granted insofar as he seeks to suppress this evidence. The Court reserves judgement as to the admissibility of any other evidence sought to be used against Varela pending further factual development.

Accordingly, **IT IS ORDERED** that Defendant Grace Hernandez–Mendiola's "Motion to Suppress Evidence and Statements and Supporting Memorandum" (Docket No. 37) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Arturo Varela–Delgado's "Motion and Brief to Suppress Evidence" (Docket No. 38) is **GRANTED IN PART.**