NOTICE
Decision filed 11/23/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160483-U

NO. 5-16-0483

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wayne County. |
| | ) | |
| v. | ) | No. 14-CF-152 |
| | ) | |
| JESSE A. McDONALD, | ) | Honorable |
| | ) | Michael J. Molt, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justice Overstreet specially concurred.
Justice Cates dissented.

**ORDER**

¶ 1    *Held*: Defendant's conviction is reversed where the trial court erred in denying defendant's motion to suppress evidence when the subject evidence was obtained through a warrantless search of defendant's residence.

¶ 2    Defendant, Jesse A. McDonald, was convicted of one count of possession of more than 500 grams but not more than 2000 grams of cannabis, in violation of section 4(f) of the Cannabis Control Act (720 ILCS 550/4(f) (West 2014)), on November 1, 2016. Defendant's conviction stemmed from a warrantless search of his residence by law enforcement officers. On direct appeal from his conviction, defendant argues that the trial court erred in denying his motion to suppress evidence from the warrantless search.

1

Defendant also argues that the trial court erred in determining that defendant consented to the search of his residence. For the following reasons, we reverse the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4    On September 29, 2014, the State filed a three-count indictment charging defendant with: count I—unlawful production of between 50 to 200 cannabis sativa plants in violation of section 8(d) of the Cannabis Control Act (720 ILCS 550/8(d) (West 2014)); count II—possession of more than 2000 grams but less than 5000 grams of cannabis with the intent to deliver or manufacture in violation of section 5(f) of the Cannabis Control Act (*id.* § 5(f)); and count III—possession of more than 2000 grams but less than 5000 grams of cannabis in violation of section 4(f) of the Cannabis Control Act (*id.* § 4(f)). An information adding count IV—unlawful production of cannabis sativa plants in violation of section 8(b) of the Cannabis Control Act (*id.* § 8(b)), was filed on June 29, 2016.

¶ 5    On May 20, 2015, defendant filed a motion to suppress evidence based on law enforcement's warrantless search of defendant's residence. A hearing on defendant's motion to suppress evidence was conducted on October 8, 2015, wherein the trial court heard the following evidence.

¶ 6    On September 18, 2014, a confidential informant notified law enforcement that defendant had cannabis plants growing on or near his premises located in a rural area of Wayne County, Illinois. Based on that information, the Wayne County Sheriff's Office requested that the Illinois State Police (ISP) conduct an aerial surveillance of defendant's

residence and nearby real estate. On September 19, 2014, the aerial surveillance was conducted, and the ISP verified that there appeared to be cannabis plants cultivating in an area north of defendant's residence.

¶ 7    On September 22, 2014, Detective Michael Vinson and Sheriff Mike Everett of the Wayne County Sheriff's Office, along with three agents from the Southern Illinois Drug Task Force (officers), drove to the area identified by the ISP as containing the cannabis plants. Three of the officers left the vehicle and proceeded across a field of weeds and brush and then through a wooded area. On the outskirts of the wooded area, the officers observed 60 to 80 suspected cannabis plants located approximately 100 yards from defendant's residence and a dirt path leading from the area of the cannabis plants to defendant's home. The officers returned to their vehicle and drove to the driveway at defendant's residence.

¶ 8    The driveway at defendant's residence began at a public road and extended approximately 60 to 70 yards perpendicular from the public road to the residence. There was an approximate 4 feet high by 12 feet wide gate[1] at the entrance to the driveway. At the suppression hearing, defendant testified that the gate was closed and that there was fencing on both sides of the gate that consisted of barbwire and five-foot fencing panels. Defendant acknowledged that there was a narrow gap in the fence on the left side of the gate behind the mailbox. Defendant stated that he utilized the gap in the fence to get his mail but claimed that the gap was blocked by two pieces of wood and some wire.

---

[1]The dimensions of the gate were not provided in the record; however, the record contains several photographs of the gate. Based on the photographs, the gate appears to have been approximately 4 feet high by 12 feet wide.

Defendant asserted that the wood and wire would have needed to be moved aside before an individual could have entered the property through the gap. Defendant further stated that there was a chain on the gate with a padlock and that, at some point, one of the officers removed the gate from its hinges in order to allow the officers' vehicle to access defendant's driveway. According to defendant, he did not own a vehicle, so he opened the gate only when he had visitors. Defendant also noted that there was a "No Trespassing" sign attached to a tree approximately a third of the way up the driveway.

¶ 9     According to defendant, at approximately 8 a.m. on September 22, 2014, he observed the officers walking up the driveway while defendant was on a telephone call with his girlfriend. Defendant terminated the conversation, shaved, and then ran out the door, meeting the officers in the driveway with his hands up, requesting that the officers not shoot at his dogs since neither dog was aggressive.

¶ 10    Defendant testified that one of the officers stated that there were suspected cannabis plants growing in an area north of defendant's residence and that the officers believed that the cannabis plants belonged to defendant. Defendant stated that he informed the officer that defendant had an attorney and would wait on a search warrant. The officer responded that a search warrant was coming and instructed defendant to contain one of the dogs due to its excessive barking. According to defendant, the officer then went over to an outbuilding and began to search it. Defendant could not identify which officer defendant spoke with at this point, but defendant maintained that he objected to any search of his property until a search warrant was produced.

4

¶ 11 Defendant testified that after speaking with the officer, he went into his house to put the dog into a kennel as instructed. Defendant asserted that when he came out of the room where the kennel was located, the officers were searching his home. Defendant further asserted that Detective Vinson read defendant his *Miranda*[2] rights and told defendant to "sit down and shut up or we would put ya [*sic*] on the ground and handcuff you." Defendant maintained that he asked the officers to leave his property and that he never gave consent for the officers to search his residence or real property.

¶ 12 The State presented a different version of the events leading to the search of defendant's residence. Detective Vinson testified that the driveway had a gate, but that the gate was not locked and was not completely shut when the officers arrived. Detective Vinson further stated that there was an opening in the fence on the left side of the gate. According to Detective Vinson, he and the other officers were able to walk unobstructed from the public road to the defendant's home either through the opening in the fence or because the gate was not completely closed. Detective Vinson vaguely recalled some items around the gate that may have been an issue in opening the gate, but nothing that impeded the officers from walking around or through the gate. Detective Vinson testified that he did not see a tree near the driveway with a "No Trespassing" sign as the officers proceeded up the driveway. Detective Vinson acknowledged that the officers did not have defendant's consent to proceed past the gate and enter defendant's property.

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that law enforcement must notify suspects of certain rights to ensure a suspect knows that he/she may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time).

5

¶ 13    Detective Vinson stated that he observed defendant coming out of the residence while the officers were proceeding up the driveway. Detective Vinson maintained that he identified himself and then advised defendant of his *Miranda* rights while both Detective Vinson and defendant were outside of defendant's residence. Detective Vinson further stated that he informed defendant of the suspected cannabis plants found near defendant's residence and that Detective Vinson needed to speak with defendant.

¶ 14    Detective Vinson asserted that while he was speaking with defendant, defendant was giving instructions to someone on how to open the gate so that the officers' vehicle could access the driveway. Detective Vinson could not recall the identity of the officer defendant was speaking with regarding the gate, nor was Detective Vinson aware of how the gate was eventually opened.

¶ 15    A short time later, Detective Vinson stated that he advised defendant that there was an odor of raw cannabis coming from inside defendant's residence. At that point, Detective Vinson maintained that defendant gave consent to enter his residence. The sole evidence presented by the State regarding defendant's voluntary consent to the search of his residence was Detective Vinson's testimony as follows:

"Q. Did you ask [defendant] about any contents of his home?

A. Not right away. A short time later I did ask, advised [defendant] that there was an odor of raw cannabis coming from inside the residence.

Q. Did he give consent to enter the residence?

A. Yes, he did."

6

Detective Vinson further testified that the Wayne County Sheriff's Department has a standard form wherein a suspect can place their signature on the form indicating their consent to a search, but that the form was not used for the search of defendant's residence.

¶ 16   Detective Vinson approximated that the search of defendant's residence was completed in a couple of hours. Detective Vinson stated that defendant was inside the residence during the entire search and that at no time during the search was defendant placed under arrest. Detective Vinson also maintained that no weapons were drawn, that no threats were made towards defendant, and that defendant never withdrew his consent to the search of his residence. Detective Vinson acknowledged, however, that the officers did not have a search warrant with respect to defendant's residence or real property at any time on September 22, 2014.

¶ 17   Next, the State presented the testimony of Sheriff Mike Everett of the Wayne County Sheriff's Office. Sheriff Everett testified that he drove the officers to a location north of defendant's residence to conduct a search for the suspected cannabis plants. Sheriff Everett remained in the vehicle while the other officers searched the area identified by the ISP's aerial surveillance. After the officers returned to the vehicle and confirmed the presence of suspected cannabis plants, Sheriff Everett drove the officers to the driveway at defendant's residence. Sheriff Everett then parked on a small farm entry road across from defendant's driveway and waited in the vehicle while the officers went to speak with defendant.

¶ 18   According to Sheriff Everett, he observed the officers walk toward the defendant's residence and observed the defendant exit his residence and speak with the officers in the driveway. Sheriff Everett stated that, at some point, an individual came and opened the gate. Sheriff Everett, however, could not recall the identity of the individual who opened the gate. Sheriff Everett could not recall whether the gate was taken off its hinges but stated that he personally did not take the gate off its hinges. Sheriff Everett could also not recall whether defendant gave consent for Sheriff Everett and/or his vehicle to enter defendant's property.

¶ 19   Sheriff Everett testified that once access to the driveway was available for his vehicle, he drove up to defendant's residence and remained outside of defendant's residence during the search. Sheriff Everett maintained that at no time during the search did he hear defendant request that the officers discontinue the search. Sheriff Everett also stated that he never heard defendant request that the officers leave defendant's home or hear defendant state anything concerning a search warrant.

¶ 20   The following contraband was seized during the search of defendant's residence and the surrounding area:

> "Item 1—Plastic Tupperware type container containing approximately 118 grams of suspected cannabis found on a table in the south bedroom of the [defendant's] residence.
>
> Item 2—Plastic Tupperware type container containing approximately 35.3 grams of suspected cannabis found on a table in the south bedroom of the [defendant's] residence.

8

Item 3—Plastic Tupperware type container containing approximately 25 grams of suspected cannabis found on a table in the south bedroom of the [defendant's] residence.

Item 4—Plastic Tupperware type container containing approximately 96 grams of suspected cannabis found on a table in the south bedroom of the [defendant's] residence.

Item 5—Plastic Tupperware type container containing approximately 103 grams of suspected cannabis found on a table in the south bedroom of the [defendant's] residence.

Item 6—Approximately 74 grams of suspected cannabis found in a cardboard box that was in a plastic 41 quart container located in the south bedroom of the [defendant's] residence.

Item 7—Plastic Tupperware type container containing approximately 19 grams of suspected cannabis found on the microwave in the kitchen of the [defendant's] residence.

Item 8—Approximately 1104 grams of suspected cannabis found hanging from strings in the south bedroom of the [defendant's] residence.

Item 9—One sandwich type baggy containing approximately 7.5 grams of suspected cannabis found on the microwave in the kitchen at the [defendant's] residence.

Item 10—Papers with tips/instruction on how to manufacture cannabis found taped to the wall in the south bedroom of the [defendant's] residence.

Item 11—One blue and chrome smoking pipe; One Swisher Sweet box containing five misc. smoking pipes and a pill bottle containing numerous partial cannabis cigarettes found in the middle bedroom of the [defendant's] residence.

Item 12—One 41 quart plastic container full of suspected cannabis stems and leaves found in the south bedroom of the [defendant's] residence. Contents were not weighed.

Item 13—One 41 quart plastic container approximately half full of suspected cannabis stems and leaves found in the south bedroom of the [defendant's residence. Contents were not weighed.

Item 14—Approximately 5 stems from suspected cannabis plants found in the trash can in the kitchen of the [defendant's] residence.

Item 15—Digital scales, trimming scissors, one grinder and suspected cannabis residue found on the microwave in the kitchen of [defendant's] residence.

Item 16—Rainbow colored glass smoking pipe with suspected cannabis residue found in the north bedroom of the [defendant's] residence.

Item 17—Approximately 80 suspected cannabis sativa plants."

¶ 21 The trial court issued a written order denying defendant's motion to suppress evidence on November 3, 2015. The trial court's written order contained, *inter alia*, the following findings:

"5. The Defendant testified that he often left the path to his mail box unobstructed; therefore, the Court finds that Detective VINSON used the entrance to the Defendant's property which was open and available to Defendant's property.

***

7. Detective VINSON testified that he smelled the aroma of raw cannabis when Defendant exited his mobile home, and that the Defendant gave permission for Detective VINSON to enter Defendant's mobile home, and search the mobile home."

¶ 22 The matter proceeded to a stipulated bench trial on count III, possession of more than 500 grams but not more than 2000 grams of cannabis, on November 1, 2016. The trial court found defendant guilty of count III and the State dismissed the remainder of the charges. The trial court sentenced defendant to two years' conditional discharge. Defendant now appeals his conviction stemming from the officers' warrantless search of his residence.

¶ 23                                    II. ANALYSIS

¶ 24 Defendant argues that the trial court erred in denying the motion to suppress evidence from the warrantless search of his property. Defendant contends that the officers violated defendant's fourth amendment rights when the officers entered defendant's property which was gated, posted, and fenced and not impliedly open to the public. As

11

such, it is defendant's position that his property was "curtilage"[3] of his residence for fourth amendment purposes. Defendant further argues that the trial court erred in finding that defendant consented to search of his residence because such a finding was against the manifest weight of the evidence.

¶ 25    We apply a two-part standard of review when considering the propriety of a trial court's ruling on a motion to suppress evidence. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). We review the trial court's findings of fact for clear error only, and we give the appropriate weight to any inferences drawn from those facts by the trial judge as the finder of fact. *Id.* This means that we afford great deference to the trial judge's factual findings and may reverse those factual findings only if they are against the manifest weight of the evidence. *Id.* However, we are nevertheless free to undertake our own assessment of the facts as they relate to the issues raised on appeal, and we therefore may draw our own conclusions concerning what relief should be granted. *Id.* As a result, we conduct a *de novo* review of the trial court's ultimate legal ruling on the motion to suppress evidence. *Id.*

¶ 26    In *United States v. Dunn*, 480 U.S. 294, 300 (1987), the United States Supreme Court recognized that the fourth amendment protects the curtilage of a house. *Id*. When faced with a curtilage issue, a court must first determine whether the claimed area meets the four-factor inquiry[4] to be curtilage and whether law enforcement violated a suspect's

---

[3]The area immediately surrounding and associated with a home is referred to as the common-law concept of "curtilage" and has been held as part of the home for fourth amendment purposes. *Florida v. Jardines*, 569 U.S. 1, 6 (2013).

[4]The *Dunn* Court set forth a four-factor inquiry for analyzing curtilage questions: (1) the proximity of the home to the area claimed to be curtilage, (2) whether the area is included within an enclosure surrounding the home,

12

fourth amendment rights by illegally entering the curtilage. Then, if a suspect later voluntarily consented to the search, the court must determine whether such consent cured the officers' illegal entry because "voluntary consent, even if established, will not by itself purge 'tainted' conduct and attenuate a subsequent search or seizure from prior illegal conduct." *People v. Koniecki*, 135 Ill. App. 3d 394, 402 (1985). Although defendant first argues the issue of whether the officers violated defendant's fourth amendment rights when the officers entered defendant's property, it is prudent for this court to first address the issue whether defendant voluntarily consented to the search since it bears upon the analysis of the curtilage issue.

¶ 27 Defendant argues that the trial court erred in finding that defendant consented to search of his residence because such a finding was against the manifest weight of the evidence. Defendant states that the Wayne County Sherriff's Office had a standard consent to search form which was not used when the officers searched defendant's residence and, therefore, there was no written documentation of the consent. There was also no audio or video recording demonstrating defendant's consent. As such, defendant argues that the trial court had to rely on a credibility determination between defendant and Detective Vinson and that such a determination should have weighed in favor of defendant since Detective Vinson gave inconsistent testimony regarding the events which led to the search of defendant's residence.

---

(3) what the claimed area is used for, and (4) any actions taken by the resident to protect the area from observation by the public. *Dunn*, 480 U.S. at 301.

13

¶ 28 The trial court found that defendant gave permission for Detective Vinson to enter and search defendant's mobile home based on Detective Vinson's testimony at the suppression hearing. Detective Vinson, however, never testified that defendant gave consent to the search of defendant's home. Detective Vinson's testimony was as follows:

"Q. Did you ask [defendant] about any contents of his home?

A. Not right away. A short time later I did ask, advised [defendant] that there was an odor of raw cannabis coming from inside the residence.

Q. Did he give consent to enter the residence?

A. Yes, he did."

The above reflects that Detective Vinson testified that defendant gave the officers consent to *enter* defendant's home. There was no evidence submitted to the trial court that demonstrated defendant consented to the *search* of his residence.

¶ 29 An invitation to enter one's residence does not necessarily imply an invitation or consent to enter all areas of that residence. It is important to consider any express or implied limitations or qualifications of the consent regarding matters such as duration, area, and intensity in order to determine the scope of the consent. *People v. Dawn*, 2013 IL App (2d) 120025, ¶ 33. "[P]ermission to enter one area, for an expressed purpose embodied in the invitation, does not imply permission to enter elsewhere, even if the further intrusion is motivated in some way by the concern that led to the initial entry." *Id.* ¶ 45.

¶ 30 The State emphasizes that the evidence demonstrated that defendant never withdrew his consent or objected in any manner throughout the search; however, failure

14

to object to the officer's actions cannot be construed as implied consent. *Id.* To do so would in effect presume consent and thus shift the burden to the defendant to prove that the officer acted without consent.

¶ 31    In this matter, we do not know if Detective Vinson asked the defendant if they could speak inside, go in the residence for a glass of water, or whether Detective Vinson specifically asked defendant if the officers could search defendant's home for contraband. As such, there was no evidence that defendant consented to the search of his home. Although we afford great deference to the trial judge's factual findings, we find that the trial court's finding that defendant gave Detective Vinson consent to search defendant's residence was against the manifest weight of the evidence. Therefore, the trial court erred in denying defendant's motion to suppress evidence from the officers' warrantless search of defendant's residence.

¶ 32    Since we have determined that the trial court's finding that defendant voluntarily consented to the search of his residence was against the manifest weight of the evidence, there is no need for this court to address the remaining issue. We reverse the circuit court's denial of defendant's motion to suppress evidence and reverse defendant's conviction because the State could not have proven defendant guilty without the evidence obtained through the illegal search.

¶ 33                                    III. CONCLUSION

¶ 34    For the foregoing reasons, we reverse the judgment of the trial court.

¶ 35    Reversed.

¶ 36   JUSTICE OVERSTREET, specially concurring:

¶ 37   I concur with the majority's decision to reverse the circuit court's order that denied the defendant's motion to suppress evidence and to reverse the defendant's conviction but do so for different reasons. The first issue the defendant raised on appeal is whether the circuit court erred in denying his motion to suppress evidence because his fourth amendment right to be free from unlawful searches and seizures was violated when officers entered his property unlawfully. I base my special concurrence on the resolution of this issue.

¶ 38   "Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures." *People v. Kratovil*, 351 Ill. App. 3d 1023, 1030 (2004). "Reasonableness in this context generally requires a warrant supported by probable cause." *Id*. "Absent probable cause or a warrant based thereon, a search is violative of the fourth amendment." *Id*.

¶ 39   Here, the record reflects that the officers discovered suspected cannabis plants in a wooded area approximately 100 yards from the defendant's residence. Detective Vinson testified that the officers subsequently approached the defendant's residence for the purpose of speaking to the defendant about what they had discovered. Hence, the officers approached the residence to conduct a "knock and talk." See *People v. Brandt*, 2019 IL App (4th) 180219, ¶ 34. "[A] police officer may lawfully 'approach a home and knock' without a warrant." *Id*. (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)). Such an intrusion is "lawful given the implicit license any private citizen has to do the same." *Id*. However, a police officer without a warrant may do " 'no more than any private citizen

16

might do.' " *Jardines*, 569 U.S. at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). A knock and talk is conducted " 'not to create a show of force, nor to make demands on occupants, nor to raid a residence.' " *Brandt*, 2019 IL App (4th) 180219, ¶ 34 (quoting *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452 (2011)). Rather, the purpose of a knock and talk " 'is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search.' " *Id.* (quoting *Gomez-Moreno*, 479 F.3d at 355).

¶ 40 Police may lawfully approach a residence for a "knock and talk" so long as they enter an area impliedly open to the public. *People v. Woodrome*, 2013 IL App (4th) 130142, ¶ 23; see also *People v. Janis*, 139 Ill. 2d 300, 310-11 (1990) (warrantless entry is a search which violates the fourth amendment where there is no evidence that the area entered is generally open to the public). When determining whether an area is impliedly open to the public, evidence that a defendant made visible efforts to exclude the public—such as placing a fence or posting a "No Trespassing" sign—is considered. *Janis*, 139 Ill. 2d at 314. Moreover, whether a defendant has a reasonable expectation of privacy in an area searched is determined by looking at the totality of the circumstances. *People v. Pitman*, 211 Ill. 2d 502, 530 (2004).

¶ 41 Here, notwithstanding any conflicting testimony on this issue, a conclusion may be drawn by reviewing the photographs in the record. The photographs establish that the area entered was not impliedly open to the public, making the officers' entry onto the property unlawful. See *Woodrome*, 2013 IL App (4th) 130142, ¶ 23. There is a wire fence

surrounding the property, along with a large metal gate spanning across and exceeding the width of the driveway, located at the end of the driveway where it adjoins the road. There is a small gap between the wire fence and the gate that the defendant walks through to retrieve his mail. The circuit court found that Detective Vinson used this gap as an entrance to the defendant's property, "which was open and available to Defendant's property."

¶ 42 Notably, the circuit court applied an incorrect standard in finding the gap to be an entrance "which was open and available" to the property. The correct standard is whether the area was "impliedly open to the public." See *id*. I do not interpret the small gap to be the equivalent of an invitation for the public to approach the residence, given the totality of the circumstances (see *Pitman*, 211 Ill. 2d at 530), nor do I conclude that the presence of the gap negates the visible efforts the defendant expended to exclude the public from his property (see *Janis*, 139 Ill. 2d at 314).

¶ 43 Besides the presence of the fence and gate, photographs in the record depict a "NO TRESPASSING" sign posted on a tree that is located approximately one third of the way down the driveway, roughly 20 yards from the gate and 40 yards from the residence. Although Detective Vinson testified that he did not see the "NO TRESPASSING" sign, he did not dispute its existence. The defendant testified that the photograph presented an accurate depiction of the tree with the "NO TRESPASSING" sign as it appeared on the date the officers entered the property. This testimony is unrebutted. There is ample evidence that the defendant made visible efforts to exclude the public from his property. *Id*. The presence of the gap does not change said efforts nor does it transmute the area

18

into one that is impliedly open to the public. I find the circuit court's conclusion that the gap between the fence and the gate was an entrance which was "open and available" to the property was against the manifest weight of the evidence. Accordingly, I conclude the officers' entry onto the property was unlawful.

¶ 44 "Under the exclusionary rule, evidence obtained during or as a direct result of an unlawful entry is generally inadmissible." *People v. Vought*, 174 Ill. App. 3d 563, 571 (1988). However, "[e]vidence will not be considered 'fruit of the poisonous tree' simply because it would not have been discovered but for the illegal actions of the police." *Id.* "Instead, the determinative question is whether the evidence has been discovered by exploitation of that illegality or by means sufficiently distinguishable to be purged of the primary taint." *Id.*

¶ 45 "Consent is a waiver of the constitutional privilege against unreasonable searches and seizures." *Kratovil*, 351 Ill. App. 3d at 1030. "A search of a home conducted pursuant to a defendant's voluntary consent is one of the specifically established exceptions to the warrant requirement." *Id.* Here, the majority found that the defendant did not consent to a search of his residence and reversed the circuit court's order and the defendant's conviction on that basis. However, even assuming, *arguendo*, that the defendant *did* voluntarily consent to the search, that consent does not, in and of itself, purge conduct that is "tainted" or attenuate a search that occurs after any prior illegal conduct. *People v. Koniecki*, 135 Ill. App. 3d 394, 402 (1985).

¶ 46 Factors to consider "in determining whether defendant's consent to the search *** sufficiently attenuated the taint of the illegal entry" include: "(1) whether *Miranda*

19

warnings were given, (2) the amount of time that elapsed between the [illegal entry] and the [discovery of the evidence], (3) the presence of any intervening circumstances, and (4) the purpose and flagrancy of the police misconduct." *Vought*, 174 Ill. App. 3d at 572 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

¶ 47    Here, the defendant and Detective Vinson both testified that *Miranda* warnings were given. However, the presence of *Miranda* warnings does not in and of itself purge the taint of the unlawful entry. See *People v. Foskey*, 136 Ill. 2d 66, 86 (1990). Of the above four factors, "the presence of intervening circumstances and the flagrancy of the police conduct are the most important." *People v. Hernandez*, 2017 IL App (1st) 150575, ¶ 95.

¶ 48    Police conduct is flagrant where, *inter alia*, the investigation was carried out in such a way as to cause surprise, fear, and confusion. *People v. Jackson*, 374 Ill. App. 3d 93, 107 (2007). Given that the area was not impliedly open to the public and the efforts the defendant expended to exclude the public, I find that the police entering the property and approaching the defendant's residence inherently evoked surprise, fear, and confusion in the defendant. The defendant's testimony supports this finding. He testified that his dogs began barking when officers approached his residence at 8 a.m. on the date in question. He was on the phone with his girlfriend at the time, so he hastily ended the call and shaved because he "was looking kind of rough." The defendant testified that he "ran out the door" and "met them in the driveway with my hands up." He testified further that he told the officers, "Don't shoot my dog." The defendant explained that his dog is "mean-looking" and he observed that "one of the officers had their hand on their gun, and

20

so I *** hurried up, because I didn't want them to shoot my dog." This testimony establishes that the officers' conduct was flagrant because it caused surprise, fear, and confusion in the defendant. See *id.*

¶ 49    Regarding the factor of intervening circumstances, there were no circumstances that broke the causal connection between the unlawful entry and the discovery of the evidence. An intervening circumstance is sufficient to break the causal connection if it results in the incriminating evidence being obtained independent of rather than because of the unlawful entry. See *Foskey*, 136 Ill. 2d at 87. No such intervening circumstances were present here, as the officers obtained the incriminating evidence as a result of—not independent of—the unlawful entry onto the defendant's property. See *id.*

¶ 50    Regarding the time factor, the record is silent regarding the precise amount of time that elapsed between the unlawful entry and the discovery of the incriminating evidence inside the defendant's residence. Testimony at the hearing established that the entire search was completed in approximately two hours. The defendant testified that when he met the officers outside, his smaller dog was also outside at that point and barking incessantly. He testified that one of the officers instructed him to put the dog in the house. The defendant indicated that he complied and that when he came out of the room where he put the dog, the officers were in the house and began to search. It thus appears that the search commenced shortly after the unlawful entry was made. Nothing in the record reflects that the discovery of the evidence was unduly prolonged. Accordingly, I find that the temporal proximity factor favors the defendant.

¶ 51 Upon considering the relevant factors, even if the defendant voluntarily consented to the search of his home, that consent did not sufficiently attenuate the taint of the unlawful entry onto the defendant's property (see *Vought*, 174 Ill. App. 3d at 572) as three of the four factors weigh against attenuation. For the foregoing reasons, I specially concur with the majority's decision to reverse the order of the circuit court that denied the defendant's motion to suppress evidence and to reverse the defendant's conviction.

¶ 52 JUSTICE CATES, dissenting:

¶ 53 On appeal, the defendant raises two challenges to the trial court's denial of his motion to suppress evidence. First, the defendant contends that law enforcement entered the defendant's property without authority, and that such unlawful entry tainted any subsequent consent to search the defendant's residence. Second, the defendant contends that the trial court erred in concluding that the defendant consented to a search of his residence.

¶ 54 My colleagues, albeit for different reasons, have concluded that the trial court erred in denying the defendant's motion to suppress. In the majority order, Justice Boie concluded that the trial court's finding that the defendant consented to the search was against the manifest weight of the evidence, and therefore found it unnecessary to consider whether law enforcement lawfully entered the defendant's property. In a special concurrence, Justice Overstreet concluded that law enforcement illegally entered upon the defendant's property, and "caused surprise, fear, and confusion in the defendant" (*supra* ¶ 48), and that even if defendant subsequently consented to a search of his residence, such consent did not attenuate the taint of the illegal entry. After reviewing the

entire record, the only reasonable conclusion is that the trial court's findings that, (1) law enforcement entered the property lawfully, and, (2) that the defendant consented to the search, are supported by the evidence and are not against the manifest weight of the evidence. Therefore, I would affirm the trial court's decision to deny the defendant's motion to suppress. Accordingly, I respectfully dissent.

¶ 55 The facts of this case are simple. Law enforcement knew, at the time they decided to approach the defendant's property, that a field suspected to contain cannabis plants was approximately 100 yards from the defendant's residence. There is no evidence in the record to suggest that at the time the officers approached the defendant's property, they had any information regarding the ownership of the land on which the cannabis plants were growing. Law enforcement had only received a "tip" from a confidential informant that someone named "McDonald" had cannabis plants growing on or near his property. The State's evidence showed that the officers went to the defendant's property to conduct what is commonly referred to as a "knock and talk." " 'The purpose of a "knock and talk" is not to create a show of force, nor to make demands on occupants, nor to raid a residence. Instead, the purpose *** is to make [an] investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search.' " *People v. Brandt*, 2019 IL App (4th) 180219, ¶ 34 (quoting *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452 (2011)). In Illinois, a "knock and talk" is permissible so long as the area where it is conducted is impliedly open to the public. *People v. Redman*, 386 Ill. App. 3d 409, 418 (2008).

¶ 56 In the special concurrence, my colleague indicates that "notwithstanding any conflicting testimony on this issue, a conclusion may be drawn from reviewing the photographs in the record." S*upra* ¶ 41. Justice Overstreet then proceeds to independently review the photographs and make findings regarding what they depict. Justice Overstreet reaches the conclusion that the photographs "establish that the area entered was not impliedly open to the public, making the officers' entry onto the property unlawful." S*upra* ¶ 41. Thereafter, my colleague finds that the actions of the officers "inherently evoked surprise, fear, and confusion," calling their conduct "flagrant" and illegal. S*upra* ¶ 48. In so finding, Justice Overstreet had not afforded proper deference to the trial court's findings as required under the applicable standard of review. As noted hereafter, we, as a court of review, are bound by certain standards of review, and are not to independently review the evidence as if we were sitting as the trial judge.

¶ 57 A circuit court's ruling on a motion to suppress presents mixed questions of fact and law and is reviewed under a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). When reviewing the circuit court's ruling on a motion to suppress, we give great deference to the trial court's findings of fact, and we accept those findings unless they are against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d at 542; *Pitman*, 211 Ill. 2d at 512. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident, or the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). This deferential standard of review is grounded in the reality that the circuit court is in a superior position

24

to observe the demeanor of the witnesses, to determine and weigh the credibility of the witnesses, and to resolve conflicts in the testimony. *Pitman*, 211 Ill. 2d at 512. However, a reviewing court may undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. *Luedemann*, 222 Ill. 2d at 542. Accordingly, we review *de novo* whether the evidence should be suppressed. *Pitman*, 211 Ill. 2d at 512.

¶ 58    Here, the trial court had the opportunity to view the photographs as the court heard the testimony of the witnesses. After considering this evidence, the court determined that when the officers walked through the opening near the gate, they were engaged in a lawful activity. During the suppression hearing, Detective Vinson testified that he was able to walk onto the defendant's property without any obstructions.[5] Another of the State's witnesses, Sheriff Everett, testified: "[i]t seemed there was a walking space to go through, around." I do not share my colleague's conclusion that the photographs establish that the area was not impliedly open to the public. I, too, have reviewed the photographs, and, after doing so, conclude that the trial court acted within its sound discretion in concluding that the opening between the gate and fence was intended as a public entry.

¶ 59    Additionally, the "NO TRESPASS" sign that was referenced by the special concurrence, is not clearly visible or even decipherable in the photographs admitted into evidence. Based on the photographs, the purported "NO TRESPASS" sign is affixed to a large tree, at an unknown distance from the gate. The two photographs demonstrate that

---

[5]The circuit court erroneously found that "[t]he [d]efendant testified that he often left the path to his mailbox unobstructed." The defendant never testified as such. Detective Vinson's testimony, however, supports a finding that the path through the defendant's fencing was unobstructed.

25

the sign blends into the dark bark of the tree and is easily obscured in the shadows created by the tree's branches. Here, it is inconceivable how my colleague made findings as he did regarding this sign, based upon the photos in the record. Again, it was up to the trial judge, who was present at the hearing, to determine whether a person entering the driveway, and walking toward the residence, would notice that sign. Detective Vinson testified that he did not notice it. After considering the testimony of the witnesses, and the photographs, I believe that the trial court could reasonably find that Detective Vinson used an entrance to the defendant's property that was impliedly open and available to the public, and that this finding was not against the manifest weight of the evidence.

¶ 60    In addition to the foregoing, and contrary to the conclusion reached by Justice Overstreet, there is no evidence in the record from which to find, or even infer, that the officers were engaged in "flagrant" conduct that caused "surprise, fear, and confusion in the defendant." Based upon the defendant's own testimony, it is reasonable to conclude that the defendant anticipated meeting law enforcement officers in the driveway to find out why the officers had come to the defendant's residence. The defendant testified that he was on a phone call when the officers entered the property, and that he took the time to shave, before going out to meet them.[6] When the defendant exited his residence, he met the officers in his driveway, and he had his hands up. Detective Vinson testified that when he met the defendant, he advised the defendant of the purpose of the visit and gave defendant *Miranda* warnings. A review of the record indicates that defendant's dogs were

_____

[6]The defendant's driveway appeared, from the photographs, to be more like a long, rock road. Perhaps this is the reason defendant had the time to conclude his call, shave, and then meet the officers in the driveway.

26

barking, perhaps disturbed by the presence of unfamiliar persons, but the defendant did not manifest any similar surprise, fear, or confusion. The fact that the defendant took the time to end his call, and shave, knowing he looked a bit "rough," indicates a conscious effort to look good for the officers, and negates any inference of surprise or confusion.

¶ 61    Defendant testified that one of his dogs looks "mean," and the defendant observed one of the officers had his hand on his gun, so the defendant "hurried up" because he did not want the officers to "shoot his dog."[7] The defendant was asked to secure his dog, and that occurred without incident. Thus, the trial court could infer from the evidence that the officers acted reasonably, and with restraint, and likewise, that the defendant acted reasonably, and mindfully, in this situation. I do not agree that this testimony demonstrates that flagrant conduct by law enforcement caused surprise, fear, and confusion in the defendant. In fact, I reach the opposite conclusion. The law enforcement officers acted reasonably in conducting their entry onto the defendant's property to conduct a "knock and talk."

¶ 62    In sum, there was ample evidence offered at the suppression hearing to establish that the officers lawfully entered the defendant's driveway for the purpose of engaging in a "knock and talk," to inquire about suspected cannabis plants growing in a field approximately 100 yards from the defendant's property. The trial court's finding that the officers entered an area impliedly open to the public for a lawful purpose is not against the manifest weight of the evidence.

---

[7]There was no testimony in the record indicating that any of the officers intended to shoot any of the defendant's dogs.

27

¶ 63    The next question, then, is whether the defendant voluntarily consented to a search of his residence. In the majority order, Justice Boie concluded that the trial court's finding that the defendant consented to a search of his residence was against the manifest weight of the evidence. Whether consent has been given is a question of fact to be determined initially by the circuit court. *Pitman*, 211 Ill. 2d at 527. Because the reviewing court is not able to observe the witnesses as they testify, it is not within the province of the reviewing court to assess the credibility of witnesses. *Pitman*, 211 Ill. 2d at 527. When the evidence on the issue of consent is conflicting, we will uphold the circuit court's finding unless it is clearly erroneous. *Pitman*, 211 Ill. 2d at 527.

¶ 64    Here, the trial court recognized that the testimony regarding the issue of consent was conflicting. The defendant testified that he did not give the officers permission to search his residence. Detective Vinson testified that upon meeting the defendant in the driveway, he smelled the odor of raw cannabis coming from inside the defendant's residence and informed the defendant of this fact. Once an officer is legitimately on a property to conduct a "knock and talk," the officer may properly observe any evidence lying about in the open, including any odors. *Redman*, 386 Ill. App. 3d at 419. Detective Vinson was lawfully on the property at the time he smelled the raw odor of cannabis. After detecting the odor of raw cannabis, Detective Vinson indicated that he obtained the defendant's consent to search his mobile home.

¶ 65    In the majority order, my colleague refers to the following colloquy during Detective Vinson's direct examination as "[t]he sole evidence presented by the State regarding defendant's voluntary consent to the search of his residence" (*supra* ¶ 15):

28

"Q. Did you ask [defendant] about any contents of his home?

A. Not right away. A short time later I did ask, advised [defendant] that there was an odor of raw cannabis coming from inside the residence.

Q. Did he give consent to enter the residence?

A. Yes, he did."

Justice Boie then opines that Detective Vinson only testified that the defendant gave consent to *enter*, not *search*, the residence—a distinction not argued by the defendant, nor supported by the record below.

¶ 66    Contrary to Justice Boie's assertion that there was scant evidence in the record to support the trial judge's conclusion regarding the consent to search, there was, indeed, additional evidence in the record, not mentioned by my colleagues. Beyond the short colloquy referenced above, other portions of the record clearly support the trial court's finding that Detective Vinson obtained a voluntary consent to search the defendant's residence. For example, during the State's direct examination, Detective Vinson also testified as follows regarding the search of the defendant's residence:

"Q. *** How long did it take you to accumulate these items?

A. I don't know. I can go back and pull log sheets to see how long we were there. A rough estimate, probably at [defendant's] residence for maybe a couple of hours.

Q. At any time did [defendant] tell you to leave?

A. No.

Q. At any time did he withdraw his consent?

A. No.

29

Q. You did not place [defendant] under arrest at any time during the search; is that right?

A. No. He was at the residence unsecured, staying at the residence with us."

¶ 67 During the defendant's cross-examination of Detective Vinson, the following colloquy occurred:

"Q. Okay. So at the moment that that discussion is occurring between [defendant] and Sheriff Everett about the opening of the gate, had [defendant] given consent to search the residence?

A. I don't know exactly—what exactly the order of the conversation, but it would have been in the same general vicinity. I don't know exactly which one would have came first."

¶ 68 In this case, the trial court observed that the defendant's testimony regarding consent was directly opposite of Detective Vinson's testimony. After observing the testimony of the witnesses, the court resolved the conflict in favor of Detective Vinson and specifically found that the defendant gave his permission for the search of defendant's premises. Aside from the defendant's testimony, which the court found to be incredible, there is nothing in the record to support even an inference that the defendant objected to the search of his residence. For example, there is no evidence that defendant made repeated calls to his attorney or used his phone to contact anyone regarding the search that was occurring in his mobile home. There is nothing to suggest that the defendant's demeanor was anything but calm. Viewing the State's evidence as a whole, and not in isolation, the trial court could reasonably find that the defendant consented to a search of his residence. After reviewing the evidence presented during the suppression hearing, I cannot conclude that the trial court's finding was clearly unreasonable.

30

¶ 69 Once the officers lawfully entered the defendant's residence, with the defendant's consent, any evidence of contraband in plain view was subject to seizure. *Redman*, 386 Ill. App. 3d at 419; *People v. Garcia*, 296 Ill. App. 3d 769, 776 (1998). Under the plain view doctrine, law enforcement may seize items without a warrant so long as the officer is lawfully in a position from which the object seized is in plain view, the object's incriminating character is immediately apparent, and the officer has a lawful right of access to the object. *People v. Sinegal*, 409 Ill. App. 3d 1130, 1134 (2011). The same analysis has been applied to smell, as the "plain smell" doctrine is simply a logical extension of the plain view doctrine. *United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006). As Detective Vinson testified, the officers spent about "a couple of hours" searching the defendant's residence. During the search, the officers seized multiple containers containing suspected cannabis, found a large quantity of cannabis hanging from strings in a bedroom, and confiscated various items of drug paraphernalia.

¶ 70 Based on the evidence presented by the State and the defendant's own actions, law enforcement conducted a valid "knock and talk" in an area seemingly open to the public. Law enforcement then obtained a voluntary consent to search the residence and legally seized the raw cannabis and paraphernalia contained in the defendant's mobile home. In my view, the trial court did not err in finding that law enforcement entered the defendant's property lawfully and that the defendant consented to the search of his residence. The court's factual findings were not against the manifest weight of the evidence and, therefore, were entitled to deference. For the foregoing reasons, I would

affirm the trial court's order denying the defendant's motion to suppress evidence. Accordingly, I respectfully dissent.